IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| WALLACE INVESTMENT LIMITED PARTNERSHIP,<br><br>    Plaintiff,<br><br><br>        vs.<br><br><br>LONE PEAK DEVELOPMENT PARTNERS LLC,<br><br>    Defendant. | MEMORANDUM OPINION AND ORDER<br><br><br><br><br>Case No. 2:10-CV-610<br><br>Judge Dee Benson |

Presently before the court is Third-Party Plaintiff Wallace Investment Limited Partnership's ("Wallace") motion for summary judgment against Lone Peak Development Partners LLC ("Lone Peak") for breach of contract and for breach of the implied covenant of good faith and fair dealing. (Doc. No. 145.) Also before the court is Lone Peak's motion for summary judgment on the claims asserted by Wallace. (Doc. No. 149.) The court held a hearing on the motions on April 18, 2014. At the hearing, Wallace was represented by Jonathan R. Schofield and Rachel L. Wertheimer. Lone Peak was represented by Joshua L. Lee. The court

took the matter under advisement. The court has considered the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKROUND

In January 2006, Lone Peak and Wallace had discussions about Wallace investing in and Lone Peak developing a residential property located in Heber, Utah, to be known as the Triple Crown Development. (Pl.'s Mot. Summ. J.) Lone Peak and Wallace believed the Triple Crown Project would be completed within eight months from the time an investment was made. (*Id*.) Later in January 2006, Lone Peak entered into a Real Estate Purchase Contract with Summit Development & Management, LLC in anticipation of purchasing the Triple Crown Property ("Property") for $9,400,000. (*Id*.)

In February 2006, Wallace provided Lone Peak with two payments totaling $500,000 to be used by Lone Peak as earnest money for Lone Peak's purchase of the Property. (*Id*.) Lone Peak subsequently asked and Wallace agreed to act as borrower for a $9,400,000 loan to purchase the Property, in connection with which Lone Peak would assign to Wallace Lone Peak's right to purchase the Property, Wallace would purchase the Property, and Lone Peak would then act as the developer of the Triple Crown Project. (*Id*.)

On February 27, 2006, Wallace and Lone Peak memorialized their agreement in writing ("Repayment Agreement"). (*Id*.) The Repayment Agreement states in relevant part:

> Lone Peak Development Partners agrees to pay the interest on the remaining balance on the loan secured by Wallace Investment Limited Partnership beginning 8 months after the closing of the Triple Crown Property in Heber City, Utah. The monies will be subtracted from their portion of the profit. Additionally Lone Peak Development Partners will pay at a simple interest rate of 8 1/2 % per annum on all amounts contributed by Wallace Investment

Limited Partnership toward the acquisition and development of the property.

* * *

Wallace Investment Limited Partnership agrees to enter a project management agreement with Lone Peak Development Partners for the improvement of this property.

(Doc. No. 145-1.)

On March 16, 2006, Lone Peak assigned its rights to purchase the Property to Wallace.

On that same day, Wallace and Lone Peak entered into a Project Management Agreement.

("Management Agreement") (Pl.'s Mot. Summ. J.)  The relevant sections of the Management

Agreement state:

> 1. <u>Subdivision of the Property</u>. . . . Upon the subdivision of the Property, the parties shall also cooperate and work together to sell the resulting Lots; provided that Owner shall retain Lot 28 as shown on the Plat.

(Ex. B, Management Agreement § 1.)

> 2. <u>Payment of Assignment Consideration</u>.  Owner and Developer acknowledge and agree that the Contract required the payment  of a $250,000.00 initial earnest money deposit, which was paid by Developer and has been reimbursed to Developer by Owner. In consideration for such reimbursement, and the assumption of Developer's obligations under the Contract, Developer and Owner shall execute an Assignment and Assumption Agreement, in the form attached hereto as Exhibit A (the "Assignment Agreement"), pursuant to which all of Developer's rights and obligations as buyer under the Contract shall be assigned to and assumed by Owner. Owner agrees not to enter into any amendment or other modification of the Contract without Developer's written consent. Owner has also paid the second $250,000.00 earnest money deposit required under the terms of the Contract and shall pay any other amounts required to be paid by the buyer under the Contract prior to the closing of the Contract.

(*Id*. § 2.)

3. <u>Loan Contributions</u>.  Owner agrees to obtain a loan (the "Loan") to finance the acquisition and development of the Property, including submitting all information requested by the lender, which lender shall be mutually agreeable to Owner and Developer.  The Loan, together with amounts paid by Owner hereunder, shall fund the aggregate acquisition and anticipated development costs applicable to the Property (including any required improvement guarantee bonds), as such costs are set forth on the construction budget attached hereto as Exhibit B (the "Construction Budget").  .  .  .  All amounts determined to be required for the acquisition and development of the Property, in excess of the Loan, will be paid solely by Owner.

(*Id*. § 3.)

9.  <u>Allocation of Net Proceeds</u>.  As sales of Lots are completed, the net sales proceeds . . . of each Lot sale shall be allocated and paid as follows:  A. First, toward the Loan until the Loan is paid in full; . . . D. Fourth, toward all accrued but unpaid Owner's Interest, until all Owner's Interest is paid in full. . . . E. Fifth, toward the repayment of all equity contributions made by Owner until the equity contributions are paid in full; . . . G. Finally, all remaining proceeds shall be divided and paid to Owner and Developer in equal amounts.

(*Id*. § 9.)

14.  <u>Default by Developer</u>.  If  (a) Developer breaches any of its obligations and responsibilities under this Agreement, (b) Developer fails to cause construction of any component of the Improvements to proceed so as to substantially satisfy the Construction Schedule, (c) Developer fails to cause construction completion by the Outside Completion Date, . . . then Owner may deliver written notice of such breach to Developer, which notice shall describe such breach in reasonable detail.  If Developer fails to cure such breach within the greater of thirty (30) days of such longer time reasonably required to remedy such breach, then Owner shall be entitled to terminate Developer as the developer to complete the Improvements in exchange for commercially reasonable compensation.  . . .  <u>In no event shall Developer be liable for actual, special, consequential or punitive damages as a result of any breach by Developer of its obligations under this Agreement except to the extent of the offset against the Development Management Fee and Developer's distributions under Section 9.G</u>. . . .

4

(*Id.* § 14.)

> 20. <u>Entire Agreement</u>. This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof . . . .

(*Id.* § 20.)

In May 2006, Wallace obtained a loan for approximately $9,400,000 from ANB Financial, Inc., to purchase the Property. Wallace closed on the Property on May 18, 2006, and executed a payment schedule prepared by the general contractor Silver Spur. (Pl.'s Mot. Summ. J. at iv.) In May 2007, Wallace refinanced the loan from ANB with a construction loan for $10,987,500 from Centennial Bank ("Centennial Loan"). (Pl.'s Mot. Summ. J. at v.) Prior to closing the Centennial Loan, however, Centennial Bank determined that the $10,987,500 loan amount was insufficient to cover the costs associated with completing the Triple Crown Project and that an additional $1,100,000 was needed. (*Id.*) Centennial Bank required Wallace to deposit $1,100,000 into a personal deposit account with Centennial Bank to cover any additional costs. Wallace deposited the funds on May 10, 2007. (*Id.*) The Centennial Loan allowed Wallace to pay off the ANB Loan and continue financing the Triple Crown Project through a development draw account. (*Id.*)

Difficulties started to arise with the Triple Crown Project in or about June 2007, when Lone Peak submitted two draw requests to Centennial Bank to pay Silver Spur approximately $334,041.07 and $477,103.05 for road work and improvements. (*Id.* at vi.) Centennial Bank refused to honor the draw requests due to concern over Lone Peak's failure to secure a final plat approval from Wasatch County. (*Id.*) As a result, Wallace refused to sign any draw requests that included Lone Peak's development management fee. The final plat was recorded on August 26,

2007, but construction was halted for approximately two months prior because Silver Spur was not paid. (*Id.*)

Around the end of 2007, Wasatch County was prepared to issue its final approval of the Triple Crown Project. Final approval from Wasatch County was critical; without it purchasers of lots in the Triple Crown Project would be unable to obtain building permits and, therefore, lot sales would be adversely impacted. Before Wasatch County would issue its final approval, however, the County required a final review from the engineering firm responsible for developing the Property, Gilson Engineering. (*Id.* at vii.) Centennial Bank refused to honor Wallace's draw requests, including a request necessary to pay Gilson Engineering, which resulted in Gilson Engineering refusing to perform the final review needed for Wasatch County's final approval of the Triple Crown Project. (*Id.*)

Due to Loan Peak's failure in obtaining final approval from Wasatch County and a lack of funding, construction on the Triple Crown Project ceased. The lots for the Triple Crown Project were unable to be sold and all of the presold lot commitments fell through. (By September 2006, 56 of the 59 lots were presold). As a result, the Centennial Loan went into default and Centennial Bank initiated a foreclosure action on the Triple Crown Project.

## DISCUSSION

Wallace brings this action for summary judgment based on its breach of contract claims against Lone Peak. Wallace asserts that Lone Peak breached both the Repayment and Management Agreements by failing to pay the interest on the loan Wallace secured in order to fund the purchase and development of the Property, and by failing to obtain the required approvals for the Triple Crown Project from Wasatch County. Lone Peak moves for summary judgment asserting that the Repayment Agreement was superseded by the Management

Agreement and that even if it breached the Management Agreement Wallace is not entitled to a money judgment because the Management Agreement limits Wallace's remedies. The court agrees with Lone Peak and for the following reasons the court grants summary judgment in favor of Lone Peak and denies Wallace's motion for summary judgment.

"Summary Judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). Upon proper motion, summary judgment will be granted unless the non-moving party must "by affidavits or otherwise—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "An issue of material fact is genuine only if a party presents facts sufficient to show that a reasonable jury could find in favor of the nonmovant." *True v. United States*, 190 F.3d 1165, 1171 (10th Cir. 1999). Conversely, "[s]ummary judgment is appropriate if the evidence is such that no reasonable jury could return a verdict for the nonmoving party." *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 920 (10th Cir. 2008).

I.      **The Management Agreement**

Lone Peak asserts the Management Agreement was breached by Wallace for failing to provide additional funding for the Triple Crown Project when Centennial Bank stopped honoring draw requests. Conversely, Wallace asserts that Lone Peak breached the Management Agreement because Lone Peak failed to obtain the required approvals from Wasatch County which would have allowed Centennial Bank to honor the submitted draw requests.

Lone Peak has failed to show Wallace was obligated to provide the additional funding Lone Peak claims was lacking, or that Wallace breached any of its contractual obligations to fund the

development.  To the contrary, the facts show Wallace satisfied its contractual obligations to

provide funding for the Triple Crown Project, including continued bank financing, and providing

excess funds above the development costs set forth in the construction budget provided by Lone

Peak.  Wallace refused to provide additional funding after Centennial Bank stopped honoring

draw requests because Lone Peak failed to obtain the required approvals from Wasatch County

when they were required, which was a condition precedent to Wallace's obligation to cooperate

with Lone Peak to submit draw requests.  Lone Peak breached the Management Agreement by

failing to obtain the required approvals from Wasatch County which would have allowed

Centennial Bank to continue to fund the Triple Crown Project.

Section 14 of the Management Agreement deals with the repercussions of a default by Lone

Peak and outlines the remedies available to Wallace.  Courts are not in the business of rewriting

contracts and will enforce an agreement according to its terms. *E.g., Richardson v. Hart*, 2009

UT App 387, ¶ 15, 223 P.3d 484.  Accordingly, in the absence of extraordinary circumstances,

courts enforce contractual limitations on remedies for breach. *See, e.g., Wilcox v. Career Step*,

LLC, 929 F.Supp 2d 1155, 1168 (D. Utah 2013); *Blaisdell v. Dentrix Dental Sys*., 2012 UT 37,

284 P.3d 616.

Under Section 14 of the Management Agreement the limitation on remedies is clear and

unambiguous.  Section 14 states in relevant part:

> In no event shall Developer be liable for actual, special,
> consequential or punitive damages as a result of any breach by
> Developer of its obligations under this Agreement except to the
> extent of the offset against the Development Management Fee and
> Developer's distributions under Section 9.G.

This Section of the Management Agreement is crucial to both parties' motions and

Wallace only briefly addresses it.  Wallace does not argue that this Section limits the damages it

may recover if Lone Peak breaches the Management Agreement, but asks the court only to find Lone Peak in breach.  However, Sections 9 and 14 make it clear that the only way Wallace can obtain a money judgment if Lone Peak breaches the Management Agreement is through the proceeds from lot sales, and/or withholding Lone Peak's development management fee.  Without monetary damages Wallace cannot obtain relief on its breach of contract claim because damages is an essential element of a contract claim.  Accordingly, Wallace's claim for breach of the Management Agreement fails as a matter of law.

II.      **The Repayment Agreement**

Wallace asserts that parol evidence is admissible to determine whether there is integration, but this principle does not apply where there is an integration clause.  *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 16, 182 P.3d 326.  Under Utah law, "evidence of prior or contemporaneous agreements or discussions is not admissible to contradict terms of a written agreement." *Cantamar, L.L.C. v.* Champagne, 2006 UT App 321, ¶ 10, 142 P.3d 140.  The Management Agreement has an integration clause: "This agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof . . . ." (Management Agreement § 20.)  Therefore, the Repayment Agreement constitutes inadmissible parol evidence to the extent it touches upon the subject matter of the Management Agreement.

The critical inquiry is whether the two agreements cover the same subject matter.  The Utah Court of Appeals has declared that "regardless of whether the parties may have had preliminary agreements about a given subject during the course of negotiations, we will assume that a writing dealing with the same subject was intended by the parties to supersede any prior or contemporaneous agreements." *Novell, Inc. v. Canopy Group, Inc.*, 2004 UT App 162, ¶14, 92

P.3d 768.  The plain language of both agreements makes it clear they cover the same subject

matter, as evidenced below:

1.  Payment of interest on the development loan:

    a.  **Repayment Agreement**—Lone Peak . . . agrees to pay the interest on the remaining balance on the loan secured by Wallace beginning 8 months after the closing of the Triple Crown property.  The monies will be subtracted from their portion of the profit.

    b.  **Management Agreement Section 3**. Loan Contributions.  Owner agrees to obtain a loan (the "Loan") to finance the acquisition and development of the Property . . . .

    c.  **Management Agreement Section 9**. Allocation of Net Sales Proceeds.  As sales of Lots are completed, the net sales proceeds . . . of each Lot sale shall be allocated and paid as follows:  A. First, toward the Loan until the Loan is paid in full; . . . E. Fifth, toward the repayment of all equity contributions made by Owner until the equity contributions are paid in full; . . . G. Finally, all remaining proceeds shall be divided and paid to Owner and Developer in equal amounts.

2.  Payment of Interest on Wallace's Loan:

    a.  **Repayment Agreement**—Additionally, Lone Peak Development Partners will pay at a simple interest rate of 8 1/2% per annum on all amounts contributed by Wallace Investment Limited Partnership toward the acquisition and development of the property.

    b.  **Management Agreement Section 3**. Loan Contributions; . . . all amounts contributed by Owner toward the acquisition and development of the Property shall accrue simple interest at the rate of eight and one half percent (8.5%) per annum (the "Owners Interest").

    c.  **Management Agreement Section 9.** Allocation of Net Sales Proceeds.  As sales of Lots are completed, the net sales proceeds . . . of each Lot sale shall be allocated and paid as follows: . . . D. Fourth, toward all accrued but unpaid Owner's Interest, until all Owner's Interest is paid in full.

3.  Wallace's retention of Lot 28:

    a.  **Repayment Agreement**—Lone Peak . . . and Wallace . . . also agree that Dean Wallace will have lot 28.

b. **Management Agreement Section 1.** <u>Subdivision of Property</u>. . . . Upon the subdivision of the Property, the parties shall also cooperate and work together to sell the resulting lots; provided that Owner shall retain Lot 28 as shown on the Plat.

4. <u>Assignment of the REPC</u>:

   a. **Repayment Agreement**—It is agreed by both parties that Lone Peak . . . will assign the real estate contract for the Triple Crown property . . . to Wallace . . . for which $500,000.00 (Five Hundred-Thousand Dollars) . . . .

   b. **Management Agreement Section 2.** <u>Payment of Assignment Consideration</u>. Owner and Developer acknowledge and agree that the Contract required the payment of a $250,000.00 initial earnest money deposit, which was paid by Developer and has been reimbursed to Developer by Owner. In consideration for such reimbursement, and the assumption of Developer's obligations under the Contract, Developer and Owner shall execute an Assignment and Assumption Agreement, in the form attached hereto as Exhibit A (the "Assignment Agreement"), pursuant to which all of Developer's rights and obligations as buyer under the Contract shall be assigned to and assumed by Owner. Owner agrees not to enter into any amendment or other modification of the Contract without Developer's written consent. Owner has also paid the second $250,000.00 earnest money deposit required under the terms of the Contract and shall pay any other amounts required to be paid by the buyer under the Contract prior to the closing of the Contract.

5. <u>Entry of project management agreement</u>.

   a. **Repayment Agreement**—Wallace . . . agrees to enter a project management agreement with Lone Peak . . . for the improvement of this property.

   b. **Management Agreement**—This Project Management Agreement (this "Agreement") is made on this 16 day of March 2006 by and between Lone Peak . . . and Wallace . . . .

As detailed above, each term of the Repayment Agreement is addressed in the Management Agreement, including payment of interest on the loan secured by Wallace, payment of interest on Wallace's contributions, and identical agreed upon interest rates. The subject matter covered in both agreements is also the same. The Management Agreement therefore supersedes the Repayment Agreement and precludes the entry of a money judgment against

Lone Peak.  Accordingly, Wallace's claim for breach of the Repayment Agreement fails as a matter of law.

III.     **If the Repayment Agreement did not Supersede the Management Agreement**

If the Repayment Agreement did not supersede the Management Agreement Wallace would still be unable to obtain damages.  The Repayment Agreement provides that "[t]he monies [due from Lone Peak] will be subtracted from their portion of the profit."  Wallace asserts that even though the parties intended the interest on the loan to be paid from Lone Peak's profit share, the Repayment Agreement does not limit Wallace's remedies if there are no profits.  However, if the money was to be paid out of the profits, and there were no profits, then the failure to pay was not a breach in the first place.  If there was no breach, there can be no claim for breach.

Additionally, in order for a contract to exist, there must be a "meeting of the minds on the central features of the agreement. . . . which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced." *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 16, 94 P.3d 179.  If there is any "uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a completed contract, in fact, there is no contract at all." *Id.* ¶ 17.  The Repayment Agreement does not specifically indicate how interest payments were to be made in the absence of any profits.  The Repayment Agreement only indicates that interest would be paid out of Lone Peak's share of the profits.  Nowhere does the Repayment Agreement indicate Lone Peak is obligated to make any interest payments in any other way.  Accordingly, Wallace's claim that Lone Peak breached the Repayment Agreement for failure to pay interest on the Centennial Loan fails.

Wallace also asserts that even if its remedies are limited with respect to interest on the loan, this limitation does not apply to interest on Wallace's contributions.  However, this assertion

only highlights an ambiguity in the Repayment Agreement. The "monies subtracted" sentence falls in the middle of the paragraph, so the question is whether it applies only to loan interest, or to contribution interest as well. The only extrinsic evidence submitted on this issue is the clarification of the parties' understanding set forth in the Management Agreement. The Management Agreement unambiguously provides that Wallace's contributions (defined as "Owners Interest") are to be paid out of the proceeds of lot sales. All the documents submitted in this case are consistent with the understanding that the parties never intended Lone Peak to be obligated to repay any interest out of pocket; it was always contemplated that such obligations would be paid through lot sales. Furthermore, the Repayment Agreement was clearly superseded by the Management Agreement. Wallace's claim for breach of the Repayment Agreement fails as a matter of law.

## IV.     Implied Covenant of Good Faith and Fair Dealing

Wallace asserts that its claim for breach of the implied covenant of good faith and fair dealing might survive even if the contract claims fail. However, Wallace has not presented any admissible evidence to support the notion that the contractual limitation on remedies would be overridden if an implied duty were breached. The Management Agreement specifically provides that "in no event" will Lone Peak be liable for damages of any kind except as an offset. Any implied terms or covenants cannot override this specifically agreed upon and bargained for term of the express and integrated written agreement between the parties. *Oakwood Vill. L.L.C. v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226. Accordingly, Wallace's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

**CONCLUSION**

For the above reasons, Wallace's Motion for Summary Judgment is DENIED. Lone

Peak's Motion for Summary Judgment on Claims of Wallace is GRANTED.


DATED this 13th day of May 2014.

_____
Dee Benson
United States District Judge